The judgment appealed from is therefore affirmed.

---

(45 South. 409.)

No. 16,576.

DURAND v. LANDRY.

(Jan. 9, 1908.)

ATTORNEY AND CLIENT — ACTION FOR COMPENSATION.
    Involves only questions of facts.
    (Syllabus by the Court.)

Appeal from Nineteenth Judicial District Court, Parish of Iberia; James Simon, Judge.

120 LA.—17

Action by Walter J. Durand against the widow of Luc Landry. Judgment for plaintiff for less than demanded, and he appeals. Reversed and suit dismissed.

See 43 South. 307, 118 La. 711.

Walter Joseph Durand, in pro. per. Burke & Burke, for appellee.

PROVOSTY, J. Luc Landry died on the 30th of October, 1905, at the age of 66. He left a widow and 12 children. Of these children three were minors, aged, respectively, 20, 18, and 17. He left a nuncupative will by public act by which he made his widow universal legatee; and left no debts, as his widow thought. His estate consisted of a farm of 96 acres, about 40 of which were in cultivation; and of the following movables: 7 horses, 4 mules, 18 head of horned cattle, 20 hogs, 16 sheep, 1 cane cart, 1 buggy, 250 chickens, household furniture, and 11 promissory notes, these notes aggregating $2,268.50, all good, and bearing 8 per cent. interest. The farm is situated about seven miles from the parish seat in the parish of Iberia. The deceased lived upon it, and most of his children lived with him.

Plaintiff is a lawyer and notary public. He brings this suit against the widow for lawyer's and notary's fees for services alleged to have been rendered her in settling the succession of her husband, and in other legal business. Defendant denies that she owes plaintiff anything. She alleges that he agreed to furnish his services gratis, and that, in any event, his charges are excessive.

Five days after the death of defendant's husband plaintiff drove up to her yard gate, and her son invited him in. Plaintiff admits that he was then a total stranger to defendant and her family, and that he introduced himself to them. His explanation of his presence at the gate is that he was taking a short cut across defendant's place on his

way to a client's, and also that defendant's husband had employed him in a certain business, and he wanted to see if defendant would confirm the employment. Plaintiff testifies that on that occasion defendant made a firm agreement with him, by which he was to settle the succession of her husband and was to have a fee of $1,675 for his services. He says that it was defendant who brought up the matter of the settlement of the succession, saying that she had been wanting to go and see him about it. Defendant testifies that it was plaintiff who brought up the matter of the succession; that he professed to have been a friend of her husband's, and asked her to see the will, and, after examining it, told her that it needed to have the stamp of the law placed upon it, and that he would have this done and return it to her, and that, in view of the esteem in which he had held her husband, he would make no charge for his own services, and she would have to pay only the costs of the court officers, which would not exceed $50. Defendant says that she reluctantly consented to let plaintiff have the will, as she and her children were perfectly satisfied with the condition in which their affairs were, and did not consider that the succession needed settling.

Three days after this first visit to defendant's house plaintiff called again, and obtained from defendant the promissory notes belonging to the succession. Defendant says he told her he wanted to have the notes "fixed in her name." After getting these notes, plaintiff sought to collect them, although none of them were mature. To that effect he mailed duns to the debtors. This led to the interview between plaintiff and defendant hereinafter extensively testified about.

Three days after this second visit, namely, on the 11th of November, 1905, plaintiff filed a petition asking for an inventory; and on the 15th he, as notary, made the inventory. On the 17th defendant qualified as tutrix of her three minor children; and her eldest son, Lucas Landry, qualified as their undertutor. On December 1st plaintiff filed a petition for the adjudication of the interest of the minors in the succession to defendant. For that purpose, on December 5th, a family meeting was held before plaintiff as notary, and on the 7th of December the proceedings of this family meeting were homologated, and the interest of minors was adjudicated to defendant. On the same day on which the family meeting was held the plaintiff, as notary, passed nine separate acts of sale by which the other heirs transferred their interests to defendant; and he furnished defendant a copy of said acts. Some of these acts of sale were passed at defendant's house.

At another time defendant gave plaintiff a canceled note of her husband's for $700 for the purpose of comparing the signature with that of a note held by the Bank of Iberia, which latter note plaintiff says defendant afterwards paid on his advice. We infer from this that defendant learned of the existence of this note to the Bank of Iberia only some time after the death of her husband, and was doubtful of the genuineness of his signature to the note.

Plaintiff says that it was at defendant's request that he caused the interest of the minors to be adjudicated to her, and passed the nine acts of sale. Defendant says that in the entire business, from beginning to end, she and her children simply did what plaintiff told them to do as necessary to be done, and without understanding anything about the business; that the family meeting was held without her knowledge; that she did not wish it.

The other legal business which plaintiff says he attended to for defendant was as follows: The husband of defendant's daughter had died, leaving a small homestead worth about $700 in Abbeville, Vermillion parish, La., and leaving a large family of small children. These children's interest in this

homestead had been adjudicated to defendant's daughter at the inventory appraisement; and defendant's daughter, by some act whose nature is not revealed by the record, had transferred same to the undertutor of the children. One of the nine promissory notes hereinabove mentioned bore mortgage on this homestead; the amount being $221. There were other debts. One a claim advanced by the undertutor for $1,200, but contested; another an admitted debt of $200 to a Mrs. Hanks. Defendant's daughter and her children were living at defendant's house. Plaintiff says that defendant employed him to recover for her daughter this homestead, and to procure the extinguishment of the debts bearing against it; and also to have the title put in her, defendant's, name. He admits that defendant gave him $296 in cash to pay the debts due to Mrs. Hanks; but he says he was to pay this debt only if he found that the debt could not be "extinguished by law." He adds that, having come to the conclusion that the debt could be gotten rid of by claiming the $1,000 homestead for defendant's daughter and her children, he did not use the money to pay the debt; that, instead of doing so, he filed suit against the undertutor, Mrs. Hanks, and defendant, praying that the transfer of the homestead to the undertutor be annulled, and that all the claims against said homestead, including that due to defendant, be decreed to have been extinguished by law. Plaintiff says, further, that the said undertutor and Mrs. Hanks filed answers in said suits, and that he made two trips to Abbeville to try the case; but that he does not know whether it has ever come to judgment. All he knows is that he has received a letter from defendant's daughter's present husband, informing him that they are now in possession of the homestead. This letter he produces. He says also that he placed $100 of the $296 given him by defendant in the hands of the attorneys of Mrs. Hanks to be paid to Mrs. Hanks in case

she would receive same in full of her claim; but that she refused, and that he believes the $100 has been returned to defendant. He says, further, that for the purpose of carrying out the plan of having the said homestead put in her name defendant turned over to him the said promissory note of $221 secured by mortgage on said homestead, and also executed a blank act of sale from her daughter to her, and also a power of attorney to him. Plaintiff produces the power of attorney referred to, but not the act of sale. Defendant says that she put the $221 note in the hands of plaintiff for him to make good her rights under it, and gave him the $296 to settle the Mrs. Hanks debt. Plaintiff produces as part of his evidence a letter from the attorneys of Mrs. Hanks to Mrs. Landry, the defendant in this suit, threatening to open the succession of her daughter's husband unless the Mrs. Hanks debt is paid.

For his services in settling the succession plaintiff claims the $1,675.66, which, he says, was agreed upon. For his services as notary he claims $250; for his services in the Abbeville business $250. He gives defendant credit for $200 which he says has already been paid by her.

Defendant denies that she has ever paid any money to plaintiff, except for the settlement of court costs, and except, also, the $296 for paying the Mrs. Hanks debt. Plaintiff is unable to say when defendant paid him the $200 in question; but says that the receipts given by him to defendant will show.

Our conclusion, in so far as the Abbeville business is concerned, is that the matter stands as defendant says, and that defendant owes plaintiff nothing for his services in said business. No amount having been agreed upon, plaintiff could recover only on a quantum meruit, and, so far as the record shows, plaintiff has not been acting as defendant's attorney; but, on the contrary, has been acting against her. The record shows that plaintiff, instead of taking steps to enforce

defendant's mortgage note, placed in his hands for that purpose, on the contrary, brought suit against defendant to have it decreed that said note had been extinguished by operation of law; and that, instead of returning to defendant her mortgage note, he delivered it to defendant's daughter, debtor on same, and with instructions not to let defendant have it; that he has used $96 of the $296 in paying court expenses in Abbeville, and has paid $100 of it to defendant's daughter and $100 to the attorneys of Mrs. Hanks without authorization from defendant; finally, that he does not appear to have represented defendant at all in said business, but to have represented her daughter exclusively. Plaintiff's statement that his employment by defendant was not limited to defendant's interest, but extended also to the protection of her daughter's, is uncorroborated, and, being contradicted by defendant, must be considered as not proved, since plaintiff holds the affirmative, and carries the burden of proof.

In so far as the settlement of the succession is concerned, if plaintiff's testimony is true, and that of defendant is false, plaintiff is unfortunate in having the very decided preponderance of the evidence against him. On his side there is his own testimony, and the improbability that he should have rendered the services gratis. On the side of defendant there is the fact that she stood in no need of the services, and that they left her in no better position than she was before, inasmuch as all she could possibly want was to keep and enjoy the share of the children in the property of the succession until her death; and she had that right already. We gather from the record that she was of an age not to think of remarrying. Then, again, there is the improbability that she would of her own motion have had recourse to a perfect stranger for the settlement of the succession of her husband. Finally, there is on defendant's side the corroborating testimony of several witnesses.

First. As to what took place on the occasion of plaintiff's first visit:

Philip Thibodeaux testifies as follows:

"Durand asked Mrs. Landry to see if all her affairs were in shape. She answered, 'Yes' (meaning that the affairs were in good shape). She told him it was useless to go to any expense and she did not understand what he wanted to do. She was good enough to give him the papers for him to see. He said he would take the will to put the legal stamp upon it. She answered she did not understand what he wanted to do with it."

The witness testifies that on another occasion Durand told Mrs. Landry that:

"After all her affairs would be straightened out it would cost her about $50. I never understood what that was for. This is all I heard and saw."

Defendant's son, Belizaire, testified, as follows:

"I saw Mr. Durand for the first time in November at home. I met him at the gate. When I noticed him, I went to meet him. He said he was Lawyer Durand. I invited him in the house and there he met all the family, and introduced himself as Lawyer Durand. We all stayed awhile on the gallery talking, and he said he knew our father well. That he used to call him 'Mon Cadien,' and asked us for a cup of coffee. It was sprinkling a little. We got in the house, talked about one thing and another. They talked about the death of our father, and he asked mother why she did not let him know of his death, and mother answered him that he was not related to us, and that she did not know him. He asked mother if her affairs were all fixed up, and she said she had the will, and did not think there was anything to do in the matter. He asked for the will and mother showed it to him, and he said that the legal stamp was missing; to let him have the will for a few days; that he would have it fixed all right, and would return it and it would cost her nothing. They then talked about other things, and Mr. Durand asked mother to go into the dining room, and, we not having any, they went into the kitchen. Durand asked that no one should go there with them. And I went into the kitchen, and he asked mother to let him see all the papers to see if nothing was wrong with them, and mother told him, 'No,' that they were all right. She showed him the papers. He piled them up together, and took memorandums from them; counted them."

Defendant is further corroborated by her daughter, Miss Blanche Landry, who says that on the day on which the family meeting

was held and the acts of sale were passed she heard plaintiff say to her mother that:

"All he would do he would charge her nothing, as he was a good friend of my father, and all it would cost us would be $50 for court costs."

This witness further says that she and the other children did not know what they were doing when they signed the nine acts; that Mr. Durand explained it, but they did not understand him. She also testifies that the family were not happy over the proceedings Mr. Durand was having, and did not approve of them; that:

"No one wanted him to do anything. Mother said she did not want anything done because everything was correct. Mr. Durand answered her that it would not cost a cent, as he was a friend of our father."

Another daughter of defendant, Mrs. Honora Jerdelle, says that:

"Mr. Durand always said he would do the work for nothing."

But it does not appear whether this witness was speaking from her own knowledge or from hearsay.

Defendant is further corroborated by Marie Broussard, who is the client whom plaintiff says he was going to see on the day he stopped at defendant's gate. This witness says that three days after the death of Luc Landry plaintiff asked her to tell Mrs. Landry to send for him. She says that plaintiff asked her to say that Mrs. Landry had said that she had as yet no money, because she had not sold her crops.

Plaintiff seeks to impeach the testimony of this witness by showing that one of the nine promissory notes already mentioned is due by her to defendant; and also by offering the answer to the suit in which he was her counsel, which was a suit in slander, in which answer the witness is charged with having been a whore and with having had eight children who were baptized as of different fathers; and also by the following cross-examination and evidence in rebuttal.

Cross-examination:

"Q. Day before yesterday did you not come into this court and ask me if I was going to put you on the witness stand while I was in court?

"A. Yes, sir.

"Q. Did I not ask you then, as I had on different occasions, what you knew of this case, and you answered: 'I went to defendant and she appeared to me downhearted, and asked her what she had, and she told me: "Mr. Durand m'a envoyé une lettre de venir lui apporter son argent, mais Mr. Durand sait bien que je ne peux pas le payer avant que je collecte l'argent de ma récolte"—meaning: "Mr. Durand sent me a letter telling me to go and bring him his money. He knows well I've no money now, as I have not sold my crop." I told you I would put this statement in a form of affidavit, which I did, and, if you would swear to it before the clerk, I would put you on the stand, otherwise I did not need you as a witness. And that while I was writing the affidavit, although you had promised me to swear to the same, you have gone away and I have never saw you until now.'

"A. When I saw Mr. Durand in the morning, he told me, 'I think I am going to discharge you, because you can't do me much good.' Then I came upstairs in court, and asked him if I could go home. He then asked me if on the day I saw Mrs. Landry I had not told him that you had found Mrs. Landry downhearted, and that you asked her what she had, if she was sick, and that she told you 'no,' she was not sick, but that it was worse than sick; that Mr. Durand had sent her a bill for debts, that Mr. Durand claimed from her, but that she did not owe Mr. Durand. And then Mr. Durand asked me to say that Mrs. Landry had said that she had no money yet because she had not sold her crops, and I answered him I could not say so because I had not told Mr. Durand so, and Mrs. Landry had not told me so, and Mrs. Landry had blamed me ever since, claiming it was my fault if Mr. Durand ever went to her house.

"Q. Have you always told this to Mr. Durand?

"A. Certainly I did.

"Q. Do you recall when Mr. Durand was out driving with his family three weeks ago, and spoke to you first in regard to your appeal to the Supreme Court, then of the piece of property you wanted to buy right next to you, and, thirdly, if you remembered anything you had told him in this case?

"A. Yes; I remember all he asked me, and all I answered him.

"Q. Do you swear that you told him what you testified you told him just before recess time?

"A. Yes; I told him the same thing. When he came with his family, he asked me, 'Marie, do you remember what you told me what Mrs. Landry had told you when you went to her house?' The only thing I told you that I had said to Mrs. Landry, 'I find you very

depressed,' and asked her if she was sick. She answered me, 'No; I'm not sick. Mr. Durand sent me a bill that got me more than sick.' Mr. Durand then asked me if Mrs. Landry had not told me that she would pay me as soon as she would have collected her money. I answered I could not say so, because I did not remember Mrs. Landry telling me any such thing. I even told him at that time that I did not care for him to summon me as a witness, because I did not want to do him or Mrs. Landry any wrong. That is all I remember telling him that day.

"Q. Did you not tell Mr. Durand that day that you had had so much trouble that your mind was somewhat uncertain in regard to Mrs. Landry having admitted to you that she could not bring him his fees, but that you would think the matter over, and, if you would recall it to a certainty you would let me know? I warn you that I propose to contradict you should you answer this question negatively.

"A. I don't think I said any such thing to Mr. Durand, for the reason that I have never had enough trouble to make me uncertain of what I was saying. If I had told so to Mr. Durand, I would have remembered it, and, if Mrs. Landry had told me, I would also have remembered it.

"Q. On that same occasion and on the same interview are you prepared to swear, and do you swear, that you did not tell Mr. Durand that you remembered Mrs. Landry having told you so, but you wanted to think the matter over and that you would let him know? I warn you I will contradict you if you answer in the negative.

"A. I could not tell Mr. Durand that Mrs. Landry told me something I know she did not tell me. I did tell Mr. Durand I would let him know if I wanted him to summon me or not. But I did not tell him I would testify to what he wanted me to do.

"Mrs. W. J. Durand being in court, witness was asked if Mrs. Durand was present at the time, place, and conversation you are testifying about?

"A. She was there.

"Q. My wife and myself were sitting in the same carriage, were we not?

"A. Yes.

"Q. Did you not go to Mrs. Lacour sometimes last week, and tell her that you had been at my office twice, and this was the third time you were coming to see me? I warn you I intend to contradict you if you answer negatively.

"A. I don't know Mrs. Lacour, but it is a lady who looks very much like the lady who is now in court.

"Q. Don't you know that the lady who is now sitting next to me is Mrs. Lacour, at whose house you went and introduced yourself as Marie Broussard to her?

"A. She looks very much like the lady I spoke to and introduced myself; but I do not know if she is Mrs. Lacour or not.

"Q. Did you not tell to this lady, Mrs. La-

cour, that this was the third time you called upon me relative to the succession of Luc Landry?

"(Witness was put on her guard.)

"A. I told her it was the fourth time I came to see Mr. Durand at his request.

"Q. Did you not tell this lady, 'Tell Mr. Durand that I remember all right that which he spoke about in front of my house relative to the succession of Luc Landry, and that it would be all right'?

"(Witness was placed on her guard.)

"A. The only thing I said to the lady that this was the fourth time I came to see Mr. Durand, and that, if he wanted to see me, he had to notify me by court because I could not come and talk with him, and find out what he wanted. The lady asked me my name, and I told her I was Marie Broussard.

"Q. Do you swear that this is all you said, and is all your previous testimony as true as this last answer?

"A. All I have said I am sure I said and heard.

"Q. Were you the plaintiff in the suit entitled 'Marie Broussard v. Jos. Sigur'?

"A. Certainly."

Rebuttal:

Mrs. Alphonse Lacour, sworn, says:

"Q. Do you know Marie Broussard, whom you just have seen in court? A. I know her. She is the party who came to my house, inquiring for Mr. Durand. She asked me if I was the mother-in-law of Mr. W. J. Durand. I answered her I was. She told me it was the third time she had come to see Mr. Durand, and she could not see him. I asked her to wait 10 minutes; that Mr. Durand would be here. She answered that the party with whom she came was in a hurry and could not wait for her. She asked me if I would deliver the message for her, and I answered, 'Yes.' She told me to tell Mr. Durand that what they had spoken about the suit was all right. Q. Did she tell you to tell me to summon her as a witness? A. She only told me that everything was all right. Q. Marie Broussard testified just now: 'The only thing I said to the lady that this was the fourth time I came to see Mr. Durand, and, if he wanted to see me, he had to notify me by court, because I could not come and talk with him and find what he wanted. The lady asked my name, and I told her I was Marie Broussard'—is this the truth Mrs. Lacour? A. There is not a word of truth in there at all."

The statements which, in this cross-examination, plaintiff makes in putting his questions, and which are denied by the witness, plaintiff, in rebuttal, testified to as being true.

This witness Marie Broussard is disinter-

ested, except that defendant holds her note for $250. *Up to the time of her testifying the pleasant relation of client and lawyer seems to have existed between her and plaintiff.* The attack on her character, while it detracts somewhat from the weight of her evidence, does not discredit her entirely as a witness. Her reputation for truth and veracity is not attacked, and plaintiff must be assumed to have known nothing against it, since he himself had summoned her as a witness in the case. She seems to be a landowner.

Further corroboration of defendant is found in the following incident: After getting possession of the nine promissory notes, plaintiff, as already mentioned, mailed a dun to each of the debtors on same, calling upon them to make payment to him; and this, although the notes were not yet mature. When defendant heard of this, she called upon plaintiff to return the notes to her. Exactly at what date this demand was made on plaintiff the record does not show; but we gather that it was after the family meeting had been held and the acts of sale had been passed.

Defendant testifies that on that occasion plaintiff said to her:

"How is it, good lady, you do not want to understand I want to fix your business, and it will not cost you a cent?"

At the interview between plaintiff and defendant on that occasion there were present Onesiphore Hebert, Lucas Landry, and Marie Broussard.

Onesiphore Hebert, who was one of the debtors of the notes, testified as follows:

"Defendant asked Mr. Durand for her papers. She was in great trouble. Mr. Durand answered her that he would return her all her papers after he would have put them in legal shape in two or three days, and that it would not cost her a cent for his services, except she would have to pay for the recordation. Q. The conversation you refer to related exclusively to these notes, did it not? A. About her notes and all her papers that she wanted returned to her. Q. Are you positive that when Durand told defendant that it would not cost her a cent for his services, that he was not only speaking of the

collection of the notes? A. The conversation was about the notes and papers that defendant wanted plaintiff to return to her. Q. When Durand said to defendant, as you testified, it would not cost her one cent, do you know of your own knowledge whether he was speaking of anything else besides these notes, or only of these notes? A. I understood him to allude to about the notes from his conversation. I cannot say if he meant anything else or not. I cannot say if they meant succession papers or not. She simply asked for her notes and papers."

Lucas Landry, son of defendant, testified as follows:

"We were in front of Kahn's store, and mother was worried and crying about her notes. And she told Mr. Durand she did not understand what he was doing. He answered her that she need not worry, as it was worrying her for nothing; and what he was doing he was charging her nothing for. Q. Did you hear Durand say why he would charge nothing? A. I did not hear anything about it. Q. The meeting you speak of in front of Kahn's store was concerning the notes which your mother had come to get from, me, was it not? A. The way it was spoken it was concerning the notes, and also concerning the business affairs had at home. Q. What are these other matters that you mean besides the notes? A. The affairs he came home about. The notes, the will, and affairs of the succession. Q. You cannot swear that, when Durand told that to your mother, he meant any other thing but the collection of the notes? A. The way Mr. Durand spoke it looked as if it meant all of the matters, notes, succession, etc., as when mother said to him that she did not understand what he was doing, and he answered her not to worry. That all he did would not cost her a cent more than $50."

Marie Broussard testified as follows:

"I heard Mrs. Landry ask Mr. Durand for the papers he had for her. Mrs. Landry said further that she wanted to withdraw the papers from him. as she did not want to go into any expense about them. Mr. Durand told her it is unnecessary to worry yourself about the papers. He said to her: 'You can go home and not worry about the papers. It will not cost you anything on account of my friendship for your husband Luc Landry.' Q. Are you prepared to swear, and do you now swear, that I was speaking of anything else but the notes of Mrs. Landry? A. They were speaking about the notes that he had for her. Q. Is it not a fact that when I told Mrs. Landry I would not charge her anything, I was speaking exclusively about the notes she wanted me to return to her, so far as you know? A. He said about the work he was doing for her it would not cost her anything, and to leave the notes with him. Q. Do you swear that this included the entire succession of Luc Landry, and not exclusively the collection of the notes? A. He was speaking about

the work he was doing for her. Q. Then you are not prepared to swear, and as a matter of fact you do not know of your own knowledge, that this was meant for anything else but the collection of the notes? A. I do not know if it was in reference to notes or anything else. I heard Mrs. Landry say to Mr. Durand that she did not want any work done, because everything was all right, and what was done between her husband and herself was well done."

Plaintiff would have it that what was said on that occasion had reference exclusively to the collection of the notes, and it is possible that the situation was open to that interpretation; but the witnesses evidently did not so understand it.

One L. R. Gaidry testified in favor of plaintiff as follows:

"Intr. 2. If you say that you know the plaintiff and defendant, will you please state whether or not you have ever seen them together, where and when? A. Yes; at the residence of defendant in Iberia parish during December, 1905, or January, 1906.

Intr. 3. At that time what was said, if anything, by the defendant herein to plaintiff in your presence and hearing concerning the said Mrs. Widow Luc B. Landry's indebtedness to W. J. Durand for his services in settling the succession of her husband? A. The plaintiff mentioned to the defendant having drawn up eighteen acts of sale, nine for recordation and the other nine to be certified copies of those recorded. I understood plaintiff to say in presence of defendant that his fee for acts above mentioned was $54, and there seemed to be a mutual understanding that these costs would be settled at the time of the general settlement between the plaintiff and defendant."

Plaintiff has also proved by Mr. A. J. Maumus, clerk of court, that on the occasion of defendant's coming to the courthouse to qualify as tutrix the following took place:

"Q. State what was said by defendant in this case to plaintiff relating to paying plaintiff his money after the crop was sold? A. I remember that after I had qualified Mrs. Landry and Lucca Landry as tutrix and undertutor that W. J. Durand and Mrs. Landry engaged in conversation. I was busy at the time writing my minutes, and did not pay any particular attention to their conversation. But I remember hearing defendant say, 'The crops are not yet settled for, and I have not the money yet'; Mr. Durand replying, 'Oh, that's all right,' and that is all I remember hearing."

What is here said by these two witnesses is entirely consistent with defendant's testimony. Defendant has not denied her liability for notarial and other court costs. The liability she denies is for attorney's fees.

It is noteworthy that, when plaintiff and the appraisers came to the house of defendant to take the inventory, they were received as personæ non gratæ. Mr. Maumus says that Mr. Toutcheque, who received them on that occasion, was "at least very impolite. Did not invite us in. Left us standing in the yard, and, when I made inquiries from him concerning the property to be inventoried, all information was absolutely refused by him and some of the family who were present."

This, by the way, accounts for the fact that the furniture was not inventoried; and is strong corroborative evidence of the statement that the family did not approve of the proceedings which plaintiff was conducting.

On the day after the inventory defendant was at the courthouse for the purpose of qualifying as tutrix.

"I told her," says Mr. Maumus, "the way we were received yesterday by Mr. Toutcheque, and she answered that she was very sorry; that Mr. Toutcheque was nothing but an employé, and, had she been there, she would have at least offered us a cup of coffee."

Plaintiff argues from this that defendant approved of the inventory; but we see in it nothing more than a disapproval of the incivility.

The district court gave plaintiff judgment for $336, less the credit of $200 admitted by plaintiff; and the appeal is by plaintiff. Defendant has answered the appeal, praying that the demand of plaintiff be rejected in toto.

How our learned Brother arrived at the conclusion he reached is not explained; but it cannot have been on the theory that plaintiff was entitled to charge $1,675 for settling the succession, or even the regulation fee, which would have been a great deal less, as is shown by the testimony of local members of the bar.

Our own conclusion is that the testimony of defendant is true, that she did not believe any court proceedings were necessary, .and only consented to any being taken because of plaintiff's insistence, and of his assurance that the expense would not exceed $50, and that her participation in them was reluctant throughout. Her distress and that of her family at the fact that any proceedings were being taken, and the hostility exhibited towards those who came to make the inventory, are very significant circumstances. From the fact that defendant made her mark to the act of sale, and from the fact that her eldest daughter can neither read nor write, and from defendant's manner of testifying, and from her whole attitude in the case, we gather that she is an uneducated woman, of no business experience, utterly ignorant of court affairs and proceedings, precisely such a person as might passively submit to being led through legal forms which she would not very well understand, but would conclude to be necessary, since she was positively told by a lawyer that they were.

On the occasion, however, when Mr. Gaidry was present, plaintiff told defendant that his notarial fees for passing the acts of transfer would be $54, and defendant appeared to consent to that charge being made. To that extent plaintiff has proven his claim, but he makes the admission in his pleadings that defendant has paid him $200. When and where this payment was made is not shown. Defendant does not admit having paid plaintiff anything for fees. She admits having paid him divers sums for costs. The only conclusion from the record is that defendant has already paid plaintiff $200 more than the amount required for costs; or that plaintiff has applied towards the payment of his fees the moneys which defendant put in his hands for paying costs. In either case he had been overpaid at the time of his filing this suit, and nothing was due him.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that this suit be dismissed, and that plaintiff pay the costs of both courts.